James **ELLIOTT**

v.

**Leander H. PEREZ, Jr., et al.**

Civ. A. Nos. 82–574, 82–584.

United States District Court,
E.D. Louisiana.

March 31, 1983.

Anna E. Dow, Baton Rouge, La., Michael S. Fawer, New Orleans, La., for plaintiffs.

Ben C. Toledano, Peter J. Butler, New Orleans, La., for defendants.

## OPINION AND ORDER

McNAMARA, District Judge.

This is a civil rights action filed pursuant to 42 U.S.C. 1983 and 1985, *et seq.,* for damages and injunctive relief against two state prosecutors, a State Court Judge, and others, alleging, *inter alia,* bad faith and malicious prosecution against the Plaintiffs, as well as the improper discharge of a Special Grand Jury, in violation of the Plaintiffs' civil rights. The causes of action alleged by each Plaintiff in this consolidated matter arise out of the following factual situation.

On August 20, 1979, Leander H. Perez, Jr. acting in his capacity as District Attorney for the Parish of Plaquemines, Louisiana, convened a Special Grand Jury to investigate the activities of certain persons in Plaquemines Parish. James Elliott, one of the Plaintiffs in the instant action, was selected as the Grand Jury's foreman. During the course of the Grand Jury's term, Plaintiff, Joseph E. Defley, Jr., appeared as a witness on two occasions.

The term of this Grand Jury was initially for one year, but its term was extended to February 19, 1981. Because the Grand Jury's investigation included the activities of Chalin O. Perez, the brother of the District Attorney, the latter recused himself from any participation in the investigation insofar as it related to or involved his brother, Chalin O. Perez. Twenty Fifth Judicial District Judge Eugene E. Leon, Jr., on October 1, 1980, appointed Giles J. Duplechin, District Attorney ad hoc, in place of the recused District Attorney.

On the evening of February 15, 1981, unbeknownst to representatives of the District Attorney's office, a brown envelope containing numerous copies of a letter of the same date from Joseph E. Defley, Jr. and addressed to James Elliott, along with an attached resolution, was delivered to his home. The letter stated in its entirety:

"February 15, 1981

Mr. James Elliott
103 Hodge Avenue
Belle Chasse, Louisiana
Dear Mr. Elliott;

Only four more days for the grand jury to complete its work. I don't envy you, because I'm sure that you have a great deal to attend to.

I hope that you will forgive this intrusion, but I was anxious to bring some ideas out which might assist the grand jury in attempting to cut down on the corruption in the Parish.

For years, I have heard people say that what Judge Perez did in forming Delta Development and fraudulently diverting mineral leases to that corporation was "not illegal—just unethical".

I disagreed with this, and on April 2, 1981, I read a (proposed) resolution before the Commission Council in which I out-

lined the fraudulent scheme by which Perez bilked the public of uncounted millions of dollars.

A copy of this resolution is enclosed—it is the same one which *60 minutes* filmed.

I believe that Luke Petrovich concurs with me in connection with my theory of the case. And for the first time, when I read of the most recent indictment, I saw that someone else—the grand jury—also thought that the scheme was fraudulent from its inception, in 1934. And of course, if you once concede that, then the children, who were given sole ownership of Delta Development in 1940, were co-conspirators, and direct, willing participants (in), and beneficiaries of, the fraud.

Parenthetically, I think that I should mention that I have two objectives in mind as far as Plaquemines Parish is concerned—first, to try to clean up the government, and it is my belief that this can only be done by establishing some kind of representative government, and secondly, to try to restore (the) oil lands to the school board, and the council, from whom they were stolen. It is not my desire to see ANYBODY go to jail, although sometimes I realize that this is necessary, either to protect the public, or to discourage others from commiting the same acts.

It appears that the power of the Perez family may be seriously eroded, and if we are successful with the reapportionment suit, we should see representative government established. Which leaves the problem of reacquiring the lands.

If we file a civil suit, it (c)ould take twenty or thirty years for it to be resolved. In addition, the defendants would initially be the Perez children, who were willing accomplices to their father's larcenous (acts). But if one or more of the children die, and the grandchildren inherit Delta Development, a court hearing the case several years from now might be reluctant to divest them of their property rights, when by no stretch of the imagination could they be said to have been privy to the original wrongdoing.

I am convinced that the solution must be political, rather than judicial. And I have been pondering the problem—trying to find an answer. I always knew that if sufficient pressure could be brought on the Perezes so as to make them consider a return of the oil lands and leases, the Parish would be the richer, by many millions of dollars.

The solution was suggested by the latest indictment of Chalin. An astute District Attorney might just be able to bargain with Chalin toward reducing the charge, or taking a light sentence in exchange for a plea or, if necessary, dropping the charge altogether, in exchange for Chalin's relinquishing any and all claims which he or Delta Development might have on Parish Lands.

This does not address the question of how pressure is to be put upon Lea and the two sisters, as well as Delta Development and the officers of that company, including Mr. Eustis.

My feeling is that they are in a position to be charged as principals in a criminal conspiracy to commit theft of public funds by fraud committed on the Parish. The original scheme, of course, dates back to 1934, but the conspiracy continues, even up to the present time. La.Rev. Statutes 14:26; 14:67.

In addition to this, they could be charged with receiving stolen things. La. Revised Statutes 14:69.

They could also be charged as accessories after the fact, in that they he(*l*)ped their father, and continue to help Delta Development Company and Mr. Eustis, to bilk the public in an ongoing scheme of fraud. La.R.S. 14:25.

Lea Perez could further be charged with malfeasance in office, for deliberate failure and refusal to investigate and prosecute the theft of public funds, which is continuing.

Perhaps, if enough pressure could be put on them, all the Perez family, as well as Delta Development, and other companies which may be involved in the

scheme, could be persuaded to cough up their ill gotten gains, in order to avoid the penalties of law.

I understand that you might have difficulty in considering indictments as outlined, because of one or more court orders, and for one reason or another, you may decide that my suggestions are not practical. I merely put them to you as being possible courses of action—you will have to consult counsel and make your own decision concerning these matters.

Please feel free to share the ideas that I have outlined, and to discuss them with the grand jury. If you want me to appear to outline these ideas, I shall be happy to—just have the secretary call me.

I hope that you will not mind my writing you—I feel a certain sense of desperation because of the short time left to the grand jury, and decided that this was the quickest means of communicating with you.

You need not bother acknowledging receipt of this letter—if you need any further information, please call me.

Thank you very much for the major effort which you and the other members of the grand jury are making—you are doing a real service to the people of the Parish of Plaquemines. Your courage and leadership will be long remembered.

Yours truly,

Joseph E. Defley, Jr.

P.S. The purpose of this letter is to serve as a continuation of my testimony; it is not intended for general circulation. I would appreciate your confining its dissemination to those who have a "need to know", as we used to say in the Marine Corps."

Attached to the Defley letter was a Resolution which Defley apparently proposed be adopted by the Plaquemines Parish Commission Council, wherein the Council was to require a strict accounting from Delta Development Company, Inc. and various members of the Perez family of all funds received in connection with any sale or lease agreement relating to public lands in Plaquemines Parish. The Resolution was to further require that certain oil companies turn over to the Plaquemines Parish Commission Council all funds which they would otherwise pay to Delta Development Company, Inc., its stockholders or assigns, insofar as said monies represent profits on public lands. Finally, the Resolution would further request that the United States Attorney for the Eastern District of Louisiana and the United States Department of Justice take whatever criminal and/or civil action necessary to secure the return of all public lands and monies unlawfully diverted by Delta Development Company, Inc., its shareholders and assigns.

Although it is uncertain how many copies of the letter were delivered to Elliott, on the following morning, Elliott distributed a copy of Defley's letter to each member of the Grand Jury and at no time did Elliott tell either Judge Leon or any legal adviser to the Grand Jury that he had received the letter from Defley.

On February 17, 1981, two days prior to the end of its term, the Grand Jury voted to indict Leander H. Perez, Jr., an officer of Delta Development Company, Inc., for the alleged unlawful taking of $43,000,000.00 in Parish funds, and Delta Development Company, Inc., for the alleged theft of $72,000,000.00 in Parish funds. After the Grand Jury voted the aforementioned indictments, James Elliott, foreman of the Special Grand Jury, attempted to secure a signature from a representative of the District Attorney's office, a formality he believed necessary to validate the indictment. Giles Duplechin, District Attorney ad hoc, refused to sign the indictment stating that his authority as ad hoc counsel only extended to matters which directly concerned Chalin O. Perez and that Leander H. Perez, Jr. still retained the role of adviser to the Grand Jury on other matters. Mr. Elliott then sought the assistance of Frank Klein, First Assistant District Attorney for the Parish of Plaquemines, who similarly declined to sign the indictment for the stated reason that he was a member of the District Attorney staff and the indictments involved the Dis-

trict Attorney and a corporation of which the District Attorney was a major stockholder and, thus, he was unable to act.

On that same date, February 17, 1981, after having his request to sign the indictments denied by both Giles Duplechin and Frank Klein, Grand Jury Foreman James Elliott, then contacted Judge Eugene E. Leon, Jr., the judicial officer in charge of the Special Grand Jury. Elliott requested that Judge Leon have the appropriate officer of the Court sign both indictments. After several telephone conversations with Judge Leon concerning the question of whether such a signature was necessary to validate the indictment, Elliott was advised by Judge Leon that he would arrange a conference with Louisiana Attorney General, William J. Guste, Jr., to discuss the matter on the morning of February 18, 1981, and that the Special Grand Jury should adjourn for the day. However, no conference involving the Attorney General, Judge Leon or Mr. Elliott ever took place because of the subsequent discharge of the Special Grand Jury at 10:10 a.m. on February 18, 1981.

Leander H. Perez, Jr. learned that the Grand Jury was considering indictments against him and Delta Development Company, Inc., from Frank Klein on February 17, 1981. The proposed indictments were the subject of a meeting at noon on that day between Perez, Klein and Judge Leon held at Belsom's Restaurant in Gretna, Louisiana, at which time Perez requested that Frank Klein prepare a Motion for Perez to recuse himself on those two matters. Klein, in fact, undertook preparation of the Motion in anticipation that Perez would file the recusal the next morning. However, the Motion was apparently never presented to the Court. Frank Klein telephoned Mr. Elliott from the restaurant to tell him that Perez was going to recuse himself and his staff (including Klein) in the investigation of Leander H. Perez, Jr. and Delta Development Company, Inc.

Subsequently, during the early evening of February 17, 1981, Perez again met with Klein. The purpose of the meeting is un-

clear. However, it is contended that neither Klein nor Perez knew of the Defley letter at that time.

It was supposedly after this second meeting with Klein that Perez learned of the Defley letter, although it is unclear as to the source of his information. In any event, Perez sought the advice of John M. Mamoulides, District Attorney of the Parish of Jefferson, and Gilbert V. Andry, III, Attorney at Law, as to the course of action he should follow. Both Mamoulides and Andry advised Perez that he had no other proper course of action than to file a motion to discharge the Grand Jury because the Grand Jury had been corrupted by outside influence. It is also unclear whether Mamoulides and Andry were aware of the impending indictments against Perez and the company of which he held a substantial interest.

On the morning of February 18, 1981, Perez presented the Motion to Discharge the Grand Jury, which had been prepared for him by Mr. Andry, along with the Defley letter to Judge Leon. Judge Leon signed the Order discharging the Special Grand Jury effective February 18, 1981, at 10:10 a.m. Following this action, Judge Leon, via telephone, advised Grand Jury Foreman, James Elliott, that the Grand Jury, which at that time was assembled at the Belle Chasse Lockup, should report immediately to his Courtroom in Point-a-la-Hache. In due time the Grand Jury appeared as directed whereupon in open court it was advised by Judge Leon that the Special Grand Jury had been discharged by Order of the Court at 10:10 a.m. on that same date. Further, at this time Judge Leon advised James Elliott that the District Attorney had filed a Bill of Information charging him and Joseph E. Defley, Jr. with the crime of conspiracy to commit extortion on Leander H. Perez, Jr., stemming from the Defley letter of February 15, 1981 to Elliott, Foreman of the Special Grand Jury.

District Attorney Perez indeed filed these Bills of Information charging Elliott and Defley with conspiracy to commit extortion on February 18, 1981, the very same day.

Defley and Elliott were both subsequently arrested, charged, incarcerated in jail and required to post bond to effect their release. It was not until March 20, 1981, that Perez recused himself from prosecution of this matter.

In addition, on February 25, 1981, one week after the discharge of the Grand Jury, a Bill of Information was filed by Assistant District Attorney Frank Klein charging Defley with jury tampering, which Bill of Information, the Plaintiff alleges, was urged by Judge Leon. Leander H. Perez, Jr. later recused himself in the jury tampering charge on May 18, 1981, allegedly after a Motion to recuse the District Attorney was filed by Defley and a hearing set to hear the matter on that same date.

On February 27, 1981, Louisiana Attorney General William J. Guste, Jr. filed a Motion in the Twenty-Fifth Judicial District Court, Parish of Plaquemines, State of Louisiana, to supersede the office of the District Attorney for the Parish of Plaquemines in any criminal matters arising out of the activities of the Special Grand Jury which had been discharged, including prosecution against members of that Grand Jury. The Attorney General was allowed to supersede the District Attorney in these matters by mandate of the Twenty-Fifth Judicial District Court, Parish of Plaquemines, on February 24, 1982, acting pursuant to a writ granted by the Louisiana Supreme Court on May 18, 1981. All charges which were pending against Defley and Elliott were subsequently dismissed by the Attorney General's office.

The Plaintiffs, James Elliott and Joseph E. Defley, Jr., subsequently filed suit on February 16, 1982, against Defendants, Leander H. Perez, Jr., Frank Klein, and Eugene E. Leon, Jr., and others seeking injunctive relief and damages for the alleged violation of the Plaintiffs' civil rights, pursuant to 42 U.S.C. 1983 and 1985, et seq. Specifically, Plaintiff, James Elliott, alleges that these Defendants, alone and in concert with each other, initiated criminal prosecution against Elliott in bad faith, on the charge of conspiracy to commit extortion, without substantial hope of obtaining a valid conviction and for the mere purpose of harassing and intimidating Elliott; that these actions were taken with retaliatory motivation to deny Elliott his right to due process under the Fourteenth Amendment; that these Defendants knowingly and intentionally conspired through criminal prosecution and improper discharge of the Special Grand Jury to wrongfully deprive the Plaintiff of his right to participate in Grand Jury proceedings and interfere with his duty to serve as a Grand Juror in violation of his constitutional rights.

Plaintiff, Joseph E. Defley, Jr., similarly alleges bad faith and malicious prosecution on the part of the Defendants in causing him to be wrongfully charged with conspiracy to commit extortion and jury tampering in violation of his right to due process of law and equal protection under the Fourteenth Amendment and his right to free speech guaranteed by the First Amendment; and further that these Defendants knowingly and intentionally conspired, through criminal prosecution and improper discharge of the Grand Jury, to prevent the indictment of the Defendant, Leander H. Perez, Jr., and Delta Development Company, Inc., in violation of his constitutional rights. The Plaintiffs have additionally alleged that Judge Leon on Motion of the Office of the District Attorney ordered that the Minutes of the Special Grand Jury be produced and impounded in his own Court allegedly in an effort to assist Perez in avoiding the indictments against him and Delta Development Company, Inc. Both Plaintiffs seek compensatory and punitive damages from the Defendants.

Defendants, Leander H. Perez, Jr. and Frank Klein, filed a Motion to Dismiss for Failure to State a Claim Upon Which Relief Can Be Granted, pursuant to Federal Rule of Civil Procedure 12(b)(6), in each of these consolidated actions, seeking dismissal of the Plaintiffs' complaints for damages on the grounds of prosecutorial immunity. Defendant, Eugene E. Leon, Jr., filed similar motions to dismiss asserting judicial immunity. The issues raised by these motions

were extensively briefed by the parties, and the Court, after hearing oral argument, took the matter under advisement. After considering the memoranda submitted, the argument of counsel and the applicable law, the Court now rules as follows.

## PROSECUTORIAL IMMUNITY

■ It should be noted, at the outset, that the general standard a Court should follow in ruling on a motion to dismiss, pursuant to Federal Rule of Civil Procedure 12(b)(6), is to accept all material factual allegations in the complaint as true and view these facts in a light most favorable to the Plaintiff. *Mann v. Adams Realty Co., Inc.,* 556 F.2d 288 (5th Cir.1977); 5 C. Wright & A. Miller 1357, at 594–96. However, where matters outside the pleadings are presented in support of this motion, and not excluded by the Court, the motion shall be treated as one for summary judgment. Rule 12(b), Fed.R.Civ.P.; *Murray v. Gelderman,* 566 F.2d 1307 (5th Cir.1978). Accordingly, because in this case sworn testimony from proceedings in another Court has been relied upon by Defendants Perez and Klein, in urging their Motion, this Court shall treat the Motion as one for summary judgment and dispose of it in accordance with Federal Rule of Civil Procedure 56.

The starting point in any analysis of a question of prosecutorial immunity from a Civil Rights suit for damages is the leading case of *Imbler v. Pachtman,* 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976), wherein the United States Supreme Court had its first opportunity to address the Section 1983 liability of a State prosecuting officer. In *Imbler,* the Plaintiff brought a civil rights action pursuant to 42 U.S.C. 1983 against a deputy district attorney alleging that the prosecutor had knowingly introduced perjured testimony and suppressed material evidence at *Imbler's* trial on criminal charges.

The Court, after reviewing the common law rule of prosecutorial immunity and its underlying policy reasons, held that prosecutors enjoy the same absolute immunity under Section 1983 as at common law.[1] The Court, in *Imbler,* expressed the considerations of public policy that underlie the common law rule, and which likewise countenance absolute immunity under Section 1983, as follows:

"A prosecutor is duty bound to exercise his best judgment both in deciding which suits to bring and in conducting them in court. The public trust of the prosecutor's office would suffer if he were constrained in making every decision by the consequences in terms of his own potential liability in a suit for damages. Such suits could be expected with some frequency, for a defendant often will transform his resentment at being prosecuted into the ascription of improper and malicious actions to the States' advocate. Further, if the prosecutor could be made to answer in Court each time such a person charged him with wrongdoing, his energy and attention would be diverted from the pressing duty of enforcing the criminal law." 96 S.Ct. at 992. (Citations omitted.)

This, the Court stated, would move us away from the desired objective of stricter and fairer law enforcement.

■ The Court further stated:

"To be sure, this immunity does leave the genuinely wronged defendant without civil redress against a prosecutor whose malicious or dishonest action deprives him of liberty. But the alternative of qualifying a prosecutor's immunity would disserve the broader public interest." Id., 96 S.Ct. at 993.

Thus, under *Imbler,* a prosecutor is absolutely immune from a civil suit for damages under 42 U.S.C. 1983 even if the action is undertaken maliciously, intentionally and in bad faith.

However, despite the broad and sweeping language contained in the opinion, the Su-

---

1. Absolute immunity for prosecutors has also been held to extend to civil suits for damages under 42 U.S.C. 1985. *Perez v. Borchers,* 567 F.2d 285 (5th Cir.1978), cert. den., 439 U.S. 831, 99 S.Ct. 109, 58 L.Ed.2d 126 (1978).

preme Court in *Imbler* was careful to limit its holding to alleged civil rights violations committed in the course of "initiating a prosecution and presenting the State's case." The Court expressly left open the question of whether the policies that mandate absolute immunity extend to those aspects of the prosecutor's responsibilities that cast him in the role of an administrator or investigative officer rather than that of advocate. The Court reasoned:

"We recognize that the duties of the prosecutor in his role as advocate for the State involve actions preliminary to the initiation of a prosecution and actions apart from the Courtroom. A prosecuting attorney is required constantly, in the course of his duty as such, to make decisions on a wide variety of sensitive issues. These include questions of whether to present a case to a grand jury, whether to file an information, whether and when to prosecute, whether to dismiss an indictment against particular defendants, which witnesses to call, and what other evidence to present. Preparation, both for the initiation of the criminal process and for a trial, may require the obtaining, reviewing, and evaluating of evidence. At some point, and with respect to some decisions, the prosecutor no doubt functions as an administrator rather than as an officer of the Court. Drawing a proper line between these functions may present difficult questions, but this case does not require us to anticipate them." Id., 96 S.Ct. at 995, n. 33.

The Fifth Circuit has since addressed this question left unanswered by the *Imbler* decision in *Marrero v. City of Hialeah,* 625 F.2d 499 (5th Cir.1980) cert. denied 450 U.S. 913, 101 S.Ct. 1353, 67 L.Ed.2d 337 (1981). There, the Court, relying upon *Imbler* and the Supreme Court's more recent holding in *Butz v. Economou,* 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978), held that State prosecutors are not entitled to absolute immunity while engaged in administrative or investigative activities, but are only entitled to a qualified (good faith) immunity in these instances.

The Court's reasoning was twofold. First, the prosecutor's immunity, which is derived from the absolute immunity accorded judges and grand jurors, is necessitated by the concern that these persons would be intimidated in the exercise of their discretion by the fear of retaliatory lawsuits brought by angry defendants. Secondly, the safeguards built into the judicial system tend to reduce the need for private damage actions as a means of controlling unconstitutional conduct. However, the Court noted that when a prosecutor steps outside the confines of the judicial setting, these checks and safeguards inherent in the judicial process do not accompany him, and thus there is a greater need for private actions to curb prosecutorial abuse and to compensate for abuse that does occur.

In *Marrero,* suit had been brought against the City of Hialeah and two state prosecutors for alleged violations of the plaintiff's civil rights under Section 1983. The particular prosecutorial activities of which the plaintiffs complained were the prosecutor's participation in an allegedly illegal search and seizure, and the prosecutor's alleged slandering of the plaintiffs' personal and business reputations by announcements made to the local news media regarding the plaintiffs' alleged criminal activities. The Court found that neither of these activities fell within the sphere of activity for which prosecutors were given absolute immunity under *Imbler.* The Court stated:

"Although the *Imbler* Court acknowledged that it will often be difficult to determine whether a particular prosecutorial activity is 'investigative or administrative' rather than 'quasi-judicial,' here we have little difficulty determining that the activities challenged are outside the scope of a prosecutor's quasi-judicial duties." *Marrero,* supra at 505.

Accordingly, because the Court found that only a qualified immunity extends to State prosecutors engaged in investigative or administrative activities, the case was remanded to the Trial Court for further proceedings.

It should be pointed out that while the Fifth Circuit recognized the United States Supreme Court in *Imbler* had rejected the approach of simply ascertaining whether the prosecutor was acting within the bounds of his authority, and emphasized that the inquiry must focus instead upon "the functional nature of the activities, rather than the prosecutor's status," the Court, nonetheless, carefully pointed out that if a State prosecutor or any other official is acting outside the scope of his authority, he is entitled to no immunity at all, qualified or absolute. *Marrero v. City of Hialeah,* supra, at 504, n. 4. This point is one of important consideration in resolving the immunity issue before this Court.

Here, Defendants, Perez and Klein, while denying the impropriety of any of their actions, have asserted that the activities complained of, i.e., the institution of criminal proceedings against the Plaintiffs and the discharge of the Special Grand Jury, are clearly within the scope of a prosecutor's quasi-judicial duties, thereby entitling them to absolute immunity under *Imbler.* The Plaintiffs, on the other hand, contend that District Attorney Perez and his assistant, Frank Klein, were not merely performing their official duties, but that their activities, unlike those of the prosecutor in *Imbler,* were engaged in for the sole purpose of furthering a *private* interest. Thus, it is alleged that Perez and Klein were acting outside the scope of their authority and, therefore, not entitled to any immunity. The Plaintiffs rely primarily upon the Ninth Circuit holding in *Beard v. Udall,* 648 F.2d 1264 (9th Cir.1981).

In *Beard,* the Plaintiffs filed suit against a State Court Judge, a county prosecutor and a county sheriff under 42 U.S.C. 1983 for alleged Constitutional violations in connection with certain civil and criminal proceedings. The Plaintiffs alleged, among other things, that Udall, the county prosecutor, caused criminal charges to be filed against the Plaintiffs in order to further civil litigation involving one of Udall's private clients and that Udall filed these charges knowing them to be baseless. The District Court awarded summary judgment in favor of the Defendants on the grounds of official immunity. The Ninth U.S. Circuit Court of Appeals on the issue of Udall's prosecutorial immunity held that where a prosecutor faces an actual conflict of interest, and files charges he or she knows to be baseless, then the prosecutor is acting outside the scope of his or her authority and thus lacks immunity. *Beard v. Udall,* supra. The Court of Appeals, therefore, remanded the case to the District Court for a determination by the trier of fact of whether *Udall* actually participated in the filing of the criminal charges and whether *Udall* knew the charges were baseless when filed. The Court reasoned that a prosecutor who faces a conflict of interest, such as *Udall* is in as poor a position to act impartially as a Judge who enters into an agreement to predetermine the outcome of a judicial proceeding, citing *Rankin v. Howard,* 633 F.2d 844 (9th Cir.1980), cert. denied 451 U.S. 939, 101 S.Ct. 2020, 68 L.Ed.2d 326 (1981), wherein the Court concluded that a prior agreement to decide in favor of one party is not a judicial act.

Similarly, in *Brooks v. Fitch,* 534 F.Supp. 129 (D.N.J.1981), a Civil Rights action was brought against an attorney in his individual capacity and in his capacity as county prosecutor alleging that the attorney abused his position as county prosecutor in initiating a criminal prosecution against the Plaintiff, with whom he had a personal dispute over a security interest in an automobile. Summary Judgment was granted in favor of the prosecutor in his official capacity. On a subsequent motion for summary judgment, the Court, on the issue of whether the prosecutor, in his individual capacity, was entitled to absolute immunity noted that except for the peculiarly personal interest of the county prosecutor in the actions taken, the prosecuting attorney would otherwise be entitled to absolute immunity, stating:

"...the decisions to extradite and to issue an arrest warrant fall within the scope of absolute immunity. The filing of the affidavit in connection with the requisition is similarly integral to the ini-

tiation and pursuit of the criminal prosecution." Id. at 132.

The Court then stated:

"Nevertheless, the event set forth in the complaint, if accurate, could indicate to a jury that Fitch was acting in a sphere which would be comparable to acting outside the scope of his jurisdiction in that his involvement was an unusually and peculiarly personal one." Id. at 134.

The Court then went on to conclude that inasmuch as the factual allegations involved a conflict of interest, a material issue of fact existed as to whether the actions taken by the prosecutor were "prosecutorial" acts, or alternatively, whether or not the acts are clearly beyond the scope of his authority, and accordingly, denied summary judgment. As a caveat, the Court stated:

"This holding is a very narrow one, limited to the peculiar circumstances of this case in which the prosecutor faced a conflict of interest (e.g., prosecutor is the complainant) and is alleged to have acted purely out of a personal involvement in a civil matter." Id. at 136.

*District Attorney Leander H. Perez, Jr.*

This Court finds the reasoning expressed in *Beard* and *Brooks* persuasive. There are several indicators which point to the existence of such a conflict of interest in the present case. As to the allegations of improper discharge of the Grand Jury, it appears quite clear that Perez was aware of the impending indictments at the time he filed the Motion to Discharge the Grand Jury on February 18, 1981, although it has been asserted that Perez did not know, at that time, that the Grand Jury had, in fact, already voted to return the indictments against Perez and Delta Development Company, Inc., but only that such indictments were under consideration by the Grand Jury, prompted by the Defley letter.

Perez has also asserted that, to the best of his knowledge, the Grand Jury had completed the function for which it was impaneled and had completed its report on all offenses presented to it by the District Attorney and his staff. The Plaintiffs, on the other hand, argue that Perez had full knowledge of the impending indictments charging him and Delta Development Company, Inc. with criminal acts, and that Perez knew the indictments had not yet been filed. Thus, the Plaintiffs allege that Perez, in moving to discharge the Special Grand Jury was merely attempting to elude prosecution.

As to the allegations of bad faith malicious prosecution, Perez filed the Bill of Information charging Elliott and Defley with conspiracy to commit extortion shortly after the Special Grand Jury had been discharged. The Plaintiffs have alleged that these charges were brought against them, as a personal political vendetta, in retaliation for their attempts to secure indictments against Perez and Delta Development Company, Inc. This Bill of Information lists District Attorney Perez as both the State Prosecutor and the victim of the alleged crime, an obvious conflict of interest.

■ Accordingly, after careful consideration of this matter, this Court finds that Leander H. Perez, Jr. was acting under his *apparent* authority as District Attorney for the Parish of Plaquemines, Louisiana, both when he moved to discharge the Special Grand Jury because of outside influence and when he filed criminal charges against the Plaintiffs. As to his actions in discharging the Grand Jury, this Court finds that Perez was acting in an administrative and/or investigative capacity as District Attorney and accordingly, at most, is only entitled to qualified immunity for these actions under *Marrero*. To benefit from this qualified immunity Perez must show that he was acting in good faith. Should the fact finder conclude he was not acting in good faith in discharging the Special Grand Jury but was motivated solely by personal interests, he would be considered acting outside of the scope of his authority and would be entitled to no immunity.

■ With regard to Perez's actions in filing the Bill of Information against Elliott and Defley, charging conspiracy to commit

extortion, this Court finds that this is precisely the type of activity for which prosecutors have absolute immunity under *Imbler* and but for the conflict issue, Perez would enjoy absolute immunity in that regard. However, if Perez was solely motivated by personal reasons, pursuant to *Beard,* he would be acting outside of the scope of his authority and would enjoy no immunity whatsoever. On the other hand, should the fact finder conclude from the evidence presented that Defendant Perez was not motivated solely by personal interests (i.e., was in good faith), he would be entitled to the benefits of *Imbler* immunity.

In summary, for Defendant Perez to have the benefit of either the qualified immunity which would attach to administrative and/or investigative actions (discharging the Special Grand Jury) or to have the benefit of the absolute immunity as set forth in *Imbler* for prosecutorial actions (filing of the Bills of Information), the test is the same. At the time of either action, i.e., discharging the Special Grand Jury or filing the Bills of Information, was Perez acting in good faith or was he solely motivated by self-interest? Material issues of fact remain before that determination can be made.[2]

*Assistant District Attorney Frank Klein*

█ As to Plaintiffs' allegations against Assistant District Attorney Frank Klein, it is undisputed that Klein had knowledge of the impending indictments against Perez and Delta Development Co., Inc. at the time he filed a Bill of Information against Defley for jury tampering, although Klein has testified that he did not learn that the Special Grand Jury had actually voted the indictments until he read the affidavit of James Elliott, which was attached to Attorney General Guste's Motion to Supersede the District Attorney filed on February 27, 1981. It has been alleged that Klein brought the charges at the insistence of Judge Leon, with strictly retaliatory motivations.

Nevertheless, Klein does not fall within the narrow exception carved out by the Ninth Circuit in *Beard.* Although Klein's conduct may have been the result of personal motivations, his personal interest was only one of potential indirect gain. Klein, unlike Perez, was not the target of any impending indictments. Nor was Klein the alleged victim, as well as prosecutor, of any criminal charges against the Plaintiffs, as was Perez. Accordingly, this Court finds that the actions of Defendant, Frank Klein, clearly fall within the scope of his quasi-judicial duties as Assistant District Attorney for the Parish of Plaquemines, Louisiana, (i.e., the initiation and pursuit of criminal prosecutions), thereby entitling him to absolute immunity under *Imbler* whether or not his actions were taken in bad faith.

## JUDICIAL IMMUNITY

Turning now to the Motion of Defendant, Eugene E. Leon, Jr., to Dismiss the Plaintiffs' claims on grounds of judicial immunity, the Court points out initially that matters outside the pleadings have not been submitted to the Court which specifically pertain to the issue of judicial immunity. Therefore, the Court, in ruling on Defendant Leon's Motion to Dismiss, will accept all material factual allegations in the Complaint as true and view these facts in a light most favorable to the Plaintiffs. 5 C. Wright and A. Miller 1357, at 594–96; *Mann v. Adams Realty Co., Inc.,* supra.

The United States Supreme Court, over a century ago, first adopted the common law doctrine of judicial immunity as "a general principal of the highest importance to the proper administration of justice that a judicial officer, in exercising the authority vested in him shall be free to act upon his own convictions, without apprehension of per-

2. It has been suggested that this Court is bound by the State Court finding of fact rendered in the proceedings initiated by Attorney General Guste to supersede the District Attorney. The Court does not agree. Excerpts from the transcript of those proceedings clearly demonstrate that Perez was not given a "full and fair opportunity" to litigate the issues before this Court. *Allen v. McCurry,* 449 U.S. 90, 101 S.Ct. 411, 66 L.Ed.2d 308 (1980).

sonal consequences to himself."[3] *Bradley v. Fisher,* 80 U.S. (13 Wall.) 335, 347, 20 L.Ed. 646 (1872). Relying upon this reasoning, the Supreme Court in *Bradley* held that "judges of courts of superior or general jurisdiction are not liable to civil actions for their judicial acts, even when such acts are in excessive of their jurisdiction, and are alleged to have been done maliciously or corruptly." *Id.* 80 U.S. (13 Wall.) at p. 351. The Court drew a distinction between acts in excess of jurisdiction, which are protected by immunity, and acts in the clear absence of all jurisdiction, which are unprotected. Judicial immunity was further extended to suits for civil damages under 42 U.S.C. 1983 in *Pierson v. Ray,* 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288.

The most recent and authoritative pronouncement on this question is *Stump v. Sparkman,* 435 U.S. 349, 98 S.Ct. 1099, 55 L.Ed.2d 331 (1978), a widely acclaimed Supreme Court case wherein a State Court Judge ordered the sterilization of a fifteen year old girl, pursuant to a petition filed by the girl's mother. A Civil Rights action was later brought by the daughter and her husband against the Judge, among others, seeking damages for the alleged violation of her constitutional rights. The Court observed:

"...the necessary inquiry in determining whether a defendant judge is immune from suit is whether at the time he took the challenged action he had jurisdiction over the subject matter before him. Because 'some of the most difficult and embarrassing questions which a judicial officer is called upon to consider and determine relate to his jurisdiction....,' the scope of the judge's jurisdiction must be construed broadly where the issue is the immunity of the judge. A judge will not be deprived of immunity because the action he took was in error, was done maliciously, or was in excess of his authority; rather, he will be subject to liability only when he has acted in the 'clear absence of

all jurisdiction.'" 98 S.Ct. at 1104-05. (Citations omitted.)

The Court later stated, "it is only for acts performed in his 'judicial' capacity that a judge is absolutely immune..." Id. 98 S.Ct. at 1106.

Relying upon the Supreme Court's holding in *Stump,* the Fifth Circuit, in *Harper v. Merckle,* supra note 3, articulated a two-part test to be used in determining whether absolute judicial immunity can be asserted. The Court's inquiry must focus on (1) whether the judge's actions were "judicial acts" and, if so, (2) whether or not they fall clearly outside of his jurisdiction. Id. at 858. However, the Fifth Circuit recognized how far the cloak of judicial immunity extends when it stated:

"...we take as settled law the proposition that in the vast majority of 1983 cases in which judges are named as defendants, judicial immunity will bar the action. Moreover, as our analysis infra at p. 859 & n. 17 reveals, we can envision no situation—where a judge acts after he is approached qua judge by parties to a case—that could possibly spawn a successful 1983 suit. In fact, we note that even a judge who is approached as a judge by a party for the purpose of conspiring to violate 1983 is properly immune from a damage suit. See, *Sparks v. Duval County Ranch Co., Inc.,* 604 F.2d 976 (5th Cir.1979) (en banc), aff'd sub nom. *Dennis v. Sparks,* 449 U.S. 24, 101 S.Ct. 183, 66 L.Ed.2d 185 (1980). But cf. *Rankin v. Howard,* 633 F.2d 844 (9th Cir. 1980)." Id. at 856, n. 9.

The Fifth Circuit, in *Harper,* shed some light on what constitutes a "judicial act" to which immunity extends. Drawing from language in its earlier opinion in *McAlester v. Brown,* 469 F.2d 1280 (5th Cir.1972), the Court noted four factors, which taken together, compel the conclusion that a judicial act is involved:

---

**3.** Although ensuring the independence of the judiciary is a crucial policy basis supporting judicial immunity, it is but one of many such policies. Others include: (1) the need to avoid

vexatious litigation against judges; and (2) the need for an end to litigation. *Harper v. Merckle,* 638 F.2d 848 (5th Cir.1981), cert. denied 454 U.S. 816, 102 S.Ct. 93, 70 L.Ed.2d 85 (1981).

"(1) The precised act complained of . . . is a normal judicial function; (2) The events involved occurred in the judge's chambers; (3) The controversy centered around a case then pending before the judge; and (4) The confrontation arose directly and immediately out of a visit to the judge in his official capacity." *Harper*, supra at 1282.

*Harper* involved a bizarre series of events wherein the plaintiff attempted to deliver a child support payment to his former wife at the courthouse where she worked. The plaintiff, *Harper*, had a confrontation with Judge Merckle, which ultimately resulted in his incarceration in jail for contempt of court. This conviction was later overturned on appeal. Harper then filed a Civil Rights action against Judge Merckle, pursuant to 42 U.S.C. 1983, *et seq.* The Court, based on the factors enumerated above, concluded that the defendant judge's actions were not "judicial acts", relying particularly on the fact that the plaintiff's incarceration did not center around any matter then pending before the judge, but rather the domestic problems of *Harper's* former wife; and further that *Harper* did not visit the judge "in his official capacity," but instead sought only his former wife, whose office was adjacent to Judge Merckle's chambers, to settle his account with her.

The Court, however, cautioned that its holding was exceedingly narrow and tailored to that rare factual setting, stating:
"... we hold only that when it is beyond reasonable dispute that a judge has acted out of personal motivation and has used his judicial office as an offensive weapon to vindicate personal objectives, and it further appears certain that no party has invoked the judicial machinery for any purpose at all, then the judge's actions do not amount to 'judicial acts.' These non-judicial acts, to state the obvious, are not cloaked with judicial immunity from suit under 1983.
We find, accordingly, that Judge Merckle should not be accorded absolute judicial immunity because his acts were not 'judicial acts.' As such, we need not reach the question of whether he acted in complete absence of jurisdiction." Id. at 859.

In following the analysis outlined above, this Court must determine whether the conduct of Judge Leon in granting the Motion to Discharge the Special Grand Jury, in allegedly conspiring to have the Plaintiffs, Elliott and Defley, indicted and in ordering that the Minutes of the Special Grand Jury be impounded in his Court, were "judicial acts," and if so, whether Judge Leon was acting "in the clear absence of all jurisdiction."

Adhering to the strict guidelines of the *Harper* decision, this Court concludes that the orders issued and/or actions taken by Judge Leon were "judicial acts" which arose out of his responsibility as the judicial officer in charge of the Special Grand Jury; and that he was not acting "in clear absence of all jurisdiction," but in his official capacity as Judge of the Twenty-Fifth Judicial District Court, Parish of Plaquemines, Louisiana. The fact that his action may later be proven erroneous or in poor judgment is of no consequence. *Stump v. Sparkman*, supra. Therefore, this Court finds that Judge Leon is entitled to the full and absolute immunity, accorded judicial officers.

Accordingly, for the reasons stated above;

IT IS ORDERED that the Motion of Defendant, Leander H. Perez, Jr., to Dismiss, is hereby DENIED.

IT IS FURTHER ORDERED that the Motion of Defendant, Frank Klein, is hereby GRANTED, dismissing the Plaintiffs' claims against Defendant, Frank Klein, in each of these consolidated actions, with costs.

IT IS FURTHER ORDERED that the Motion of Defendant, Eugene E. Leon, Jr., to Dismiss, is hereby GRANTED, dismissing the Plaintiffs' claims against Defendant, Eugene E. Leon, Jr., in each of these consolidated actions, with costs.